UNITED STATES BANKRUPCY COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

In re:  GREGORY A. COLE,                              Case No. 15-30979-KLP
                    Debtor.                           Chapter 13

## <u>MEMORANDUM OPINION</u>

This matter is before the Court on 1) the objection to confirmation of the Debtor's chapter 13 Plan filed by Tricia P. Cole ("Ms. Cole"), 2) the objection to confirmation filed by Carl M. Bates, Chapter 13 Trustee (the "Trustee"), and 3) the Debtor's objection to Ms. Cole's proof of claim.  An evidentiary hearing was held on November 10, 2015.

Ms. Cole contends that confirmation of the Debtor's plan should be denied because the plan fails to provide for payment in full of all domestic support obligations, was not filed in good faith, fails to satisfy the liquidation test required under § 1325(a)(4) of the Bankruptcy Code, 11 U.S.C. § 1325(a)(4),[1] and fails to include all of the Debtor's projected disposable income for the applicable period, as required under § 1325(b)(1)(B). The Trustee, for the same reasons asserted by Ms. Cole, contends that the plan does not satisfy § 1325(a)(4) and (b)(1)(B).[2]  The Debtor maintains that the plan should be confirmed because it satisfies all of the criteria for confirmation prescribed by § 1325(a) and includes a commitment by the Debtor of all of his projected disposable income as required under § 1325(b)(1)(B).

The Debtor has objected to the proof of claim filed by Ms. Cole in this case.  Ms. Cole claims that $50,000 in attorney's fees awarded to her in connection with state court divorce proceedings constitutes a priority domestic support obligation, as defined by

---

[1] Unless otherwise noted, all further statutory references are to the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532.
[2] The Trustee took a limited role during the evidentiary hearing held on November 10, 2015, relying primarily on the evidence and arguments submitted by Ms. Cole.

§ 101(14A) of the Bankruptcy Code, that should be paid in full through the Debtor's chapter 13 plan pursuant to § 1322(a)(2). The Debtor contends that the attorney's fees do not constitute a domestic support obligation and therefore should be allowed only as a general unsecured claim.

## Jurisdiction

The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157(a) and (b)(1) and 1334 and the general order of reference entered by the United States District Court for the Eastern District of Virginia on August 15, 1984. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (L) and (O). This Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, Fed. R. Bankr. P. 7052.[3]

## Facts

Gregory A. Cole ("Dr. Cole" or the "Debtor") and Ms. Cole were married on September 8, 2001 and separated on April 21, 2011. Ms. Cole filed a complaint for divorce on July 30, 2010, seeking a divorce *a vincula matrimonii* on the grounds of adultery or, in the alternative, on the grounds of cruelty and constructive desertion or, in the alternative, on the grounds of a one-year period of separation. Dr. Cole filed an answer and counterclaim in which he asserted his privilege under the Fifth Amendment regarding his alleged adultery and sought a divorce *a vincula matrimonii* on the grounds of a one-year period of separation. The matter was tried in the Circuit Court for the County of Chesterfield, Virginia, (the "Circuit Court") on the issues of grounds for

---

[3] Where appropriate, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact. *See* Fed. R. Bankr. P. 7052.

Subsequent references to the Bankruptcy Rules are to the Federal Rules of Bankruptcy Procedure, Fed. R. Bankr. P. 1001-9037.

divorce, equitable distribution, spousal support, child support, custody, visitation, and attorney's fees and costs.  In a letter opinion dated September 26, 2014 (the "Letter Opinion"), the Circuit Court ruled on the issues of grounds for divorce, equitable distribution, spousal support, child support, and attorney's fees and costs.  A final decree of divorce, incorporating the Letter Opinion, was entered by the Circuit Court on December 19, 2014.[4]

The Circuit Court awarded Ms. Cole a final divorce on the grounds of adultery, provided for the division of property, and ordered Dr. Cole to pay Ms. Cole the sum of $4000 per month in spousal support and $754 per month in child support, as well as the sum of $38,000 in spousal support arrearages.  The Circuit Court also ordered Dr. Cole to pay the sum of $70,000 directly to Ms. Cole for attorney's fees and costs.  In the Letter Opinion, the court cited a number of factors supporting the fee award:

> First, the grounds for divorce is adultery by Dr. Cole, compounded by his dishonesty about it.  If Mrs. Cole did not cause or contribute to the collapse of the marriage, why should she pay for necessary legal services to clean it up?   Second, the financial resources of the parties are quite unequal.  Dr. Cole earns roughly four times what Mrs. Cole earns.  Third, the overall results obtained in this litigation generally demonstrate that Mrs. Cole is the prevailing party.   Next, my review of the parties' respective memoranda regarding attorney fees creates the distinct impression that Mrs. Cole was more willing to negotiate and settle than was Dr. Cole.  The apparent debacle of the settlement conference is one notable example.  In the end, it was necessary to resolve this case only by a "full blown" trial.  Taking all these factors into account, I will award Mrs. Cole $70,000 in attorney fees, to be paid by Dr. Cole within 90 days of the date of entry of the Final Decree, or as otherwise mutually agreed by the parties.

---

[4] At the November 10 hearing, the Letter Opinion (Ex. 1) and the final decree of divorce (Ex. 2) were admitted into evidence without objection.

Ex. 1 at 18.  Prior to his bankruptcy filing, Dr. Cole paid Mrs. Cole $20,000 of the

attorney's fees award, leaving a balance due of $50,000.  He also paid $25,000 toward

the spousal support arrearages, leaving an unpaid balance of $13,000.

On February 27, 2015, Dr. Cole filed a voluntary petition under chapter 13 of the

Bankruptcy Code, and on March 4, 2015, he filed his chapter 13 plan (the "Plan") (Ex.

4).  The Plan is funded by sixty equal monthly payments of $1100 to the Trustee for a

total funding of $66,000.  The Plan provides for payment of administrative expenses,

including a trustee's commission of 10% and $4600 in attorney's fees, and for payment

of $13,000 to Ms. Cole for a priority domestic support obligation pursuant to 11 U.S.C. §

507(a)(1).  The remaining funds are available for unsecured creditors.[5]  Section 4(A) of

the Plan provides that the "[e]stimated distribution [to unsecured creditors] is

approximately 15% . . . . If this case were liquidated under Chapter 7, the debtor(s)

estimate that unsecured creditors would receive a dividend of approximately 6%."

On March 19, 2015, Ms. Cole timely filed her proof of claim (the "Claim") in the

total amount of $132,969, comprised of $13,000 in spousal support arrearages, $50,000

in court ordered legal fees, and $69,969 owed in connection with equitable distribution,

asserting that the full amount of the Claim is a domestic support obligation entitled to

priority pursuant to § 507(a)(1) of the Bankruptcy Code.  On April 9, 2015, the Debtor

filed an objection to the Claim, asserting that while the total dollar amount of the Claim is

correct, only $13,000 of the Claim should be allowed as a domestic support obligation

entitled to priority and that the remainder of the Claim should be allowed as a general

unsecured claim.

---

[5] The Plan also provides for direct payments by the Debtor to First Commonwealth FCU, a
creditor secured by a motor vehicle.  These payments are to be paid in addition to the monthly
payments to the Trustee and would not impact the proposed distribution to unsecured creditors.

Three other creditors have filed claims in the case, the largest of which was filed by the Debtor's parents, who filed an unsecured claim in the amount of $69,388.25. The other two claims are a secured claim filed by First Commonwealth FCU in the amount of $1340.55[6] and an unsecured claim in the amount of $156.50 filed by eCAST Settlement Corporation. The deadline for any other creditor to file a claim has expired.[7]

At the time of the parties' separation and divorce, on the date the Debtor filed his petition in bankruptcy, and on the date of the hearing on Ms. Cole's objection to confirmation of the Plan, Dr. Cole owned a 25% interest in a dental practice known as Schroeder, Stenger, & Cole, DDS, P.C.[8] (the "Practice" or the "Corporation"), which he acquired in 2008 for a purchase price of $325,000. In the divorce proceedings, in ruling on the issue of equitable distribution, the Circuit Court was required to determine the value of Dr. Cole's interest in the Practice. There, the parties agreed to a valuation date of September 30, 2013, and each party offered the opinion of a business valuation expert. Ms. Cole's expert, Robert Raymond, valued Dr. Cole's interest at $212,000. Dr. Cole's expert, Dean Heinberg, valued Dr. Cole's interest at $15,782. The Circuit Court noted

---

[6] Testimony at the November 10, evidentiary hearing established that the debt to First Commonwealth FCU has been fully paid. (Tr. at 49, ll. 12-21)
    All references to the transcript are to the transcript of the evidentiary hearing held in this Court on November 10, 2015.
[7] According to the Debtor's schedules, the only other creditor to whom a debt was owed at the time of filing is Bank of America. The Debtor listed Bank of America as an unsecured creditor in the amount of $3538. (Ex. 4 at 11) Bank of America did not file a claim in the case.
[8] The record is unclear regarding the current name of the professional corporation in which the Debtor holds an interest. The Debtor's schedules and statement of financial affairs refer to the entity as both "Schroeder, Stenger & Cole, DDS, PC," and "Schroeder, Stenger, Cole & Associates." However, the Circuit Court and various other documents refer to it as "Schroeder, Stenger, Cole & Associates, P.C." The most recent tax return of the corporation (Ex. C) lists the current name as "Drs. Stenger, Cole, Gupta & Assoc PC." Neither party has offered any explanation for the different names; however, the Court notes that same tax identification number appears in connection with the dental practice despite the variations in its name, and all of the evidence corroborates the existence of a single entity.

that for purposes of equitable distribution, the "relevant standard of value is the 'intrinsic value' of the business interest, to these parties"[9] (Ex. 1 at 4) and, after commenting on various reasons why it found the valuation proffered by Ms. Cole to be more persuasive, adopted Mr. Raymond's value of $212,000 for Dr. Cole's 25% interest in the Practice. The Circuit Court criticized Mr. Heinberg's valuation, in part, because he assigned "no value whatsoever to ongoing patient relationships (denoted as 'patient charts')," which the Circuit Court described as "the going concern value."  (Ex. 1 at 4).

At the hearing before this Court on November 10, the Debtor offered the testimony of Dean Heinberg, the same valuation expert who testified on his behalf in the divorce proceedings.  Mr. Heinberg testified that the "liquidation value of Dr. Cole's practice as a personal-services company" is "zero" because the liabilities of the entity exceed the value of its assets.  (Tr. at 31, ll. 4-12).  He placed no value on patient records. (Tr. at 30, ll. 5-23).

The Debtor also offered the testimony of an experienced chapter 7 trustee, Bruce Matson.  Mr. Matson testified that he had reviewed various documents, including an operating agreement, the shareholders' agreement, a balance sheet, and other financial information relating to the Practice.  He stated that if he were appointed to administer Dr. Cole's bankruptcy estate as a chapter 7 trustee, he would abandon the interest in the Practice because he does not believe there is "anyone who would pay anything in the open market, for that twenty-five percent interest."  (Tr. at 41, ll. 12-24).  He further testified that his opinion was based in part on his assumption that Dr. Cole would be able to continue practicing dentistry, presumably in competition with whoever may acquire his

---

[9] The Circuit Court stated that the "intrinsic value" is "inherently – and deliberately—a very subjective concept that attempts to determine the worth of the business interest to these parties." (Ex. 1 at 4.)

interest, which would discourage another dentist from purchasing his interest.  (Tr. at 42,

ll. 3-11).

Ms. Cole offered the testimony of Robert Raymond, the valuation expert who had

testified on her behalf in the divorce proceedings.  Mr. Raymond testified that he has

valued approximately 300 medical practices, including about 75-100 dental practices (Tr.

at 78, ll. 16-23), though few in the context of a chapter 7 liquidation.  (Tr. at 97, ll. 3-6).

Mr. Raymond disagreed with Mr. Heinberg 's opinion that the patient records have no

value, stating that "far and away the most significant asset of any dental practice is its

patient base."  (Tr. at 89, ll.  8-9).  His testimony regarding the value of Dr. Cole's

interest in the Practice was primarily based on a division of proceeds after a sale of the

whole practice rather than the isolated sale or liquidation of Dr. Cole's 25% interest.  Mr.

Raymond's revised valuation (updating that which was submitted in the Circuit Court)

places a value of $203,000 as of December 31, 2014, for Dr. Cole's interest in the

Practice.  (Ex. 15).

Mr. Raymond's testimony included his analysis of the shareholders' agreement

existing between Dr. Cole and the other shareholders of the Practice.[10]   Mr. Raymond

---

[10] Ms. Cole offered into evidence a document entitled Amended and Restated Shareholder
Agreement dated December 22, 2008, which was admitted without objection as Exhibit 6.  This
document includes as parties the professional corporation, Schroeder, Stenger, & Associates,
P.C., Dr. Schroeder, Dr. Stenger and Dr. Cole.  According to its terms, it represents an
amendment to the original shareholder agreement between the professional corporation, Dr.
Schroeder and Dr. Stenger dated January 24, 1992, and was occasioned by Dr. Cole's purchase of
an interest in the professional corporation.  Dr. Gupta subsequently acquired an interest in the
professional corporation from Dr. Schroeder pursuant to an Agreement for Purchase and Sale of
Stock dated July 1, 2011 (the "Gupta Stock Purchase Agreement") (Ex. W).  The Gupta Stock
Purchase Agreement includes, as a condition to closing, the execution by the shareholders and the
professional corporation of a Second Amended and Restated Shareholder Agreement.  While the
Second Amended and Restated Shareholder Agreement, dated July 1, 2011, was not introduced as
a separate, standalone exhibit, a copy of the fully executed Second Amended and Restated
Shareholder Agreement is attached to the valuation as of September 30, 2013, prepared by Mr.
Raymond and offered into evidence by both parties (Ex. 6; Ex. H).  It appearing from the record

testified that the shareholders' agreement (the "Shareholders' Agreement"), which he described as "unlike anything [he] had seen," includes a formula for determining "an absolute floor" that Dr. Cole would be able to obtain from the other shareholders in exchange for his shares.  (Tr. at 84, ll. 2-19).  At the time he prepared his valuation for the Circuit Court proceedings, Mr. Raymond valued the floor or "buyout" at $114,175.  (Tr. at 85, ll. 3-10).  Mr. Raymond updated his valuation for the bankruptcy proceedings and, applying the same formula, he calculated the buyout as having a value of $161,268 as of December 31, 2014.  (Tr. at 93, ll. 13-22; Ex. 15).

The Shareholders' Agreement includes the following provision regarding transfer of shares of the Corporation:

> **Except as otherwise provided in this Agreement**, no Shareholder shall sell, exchange, deliver or assign, dispose of . . . transfer or permit to be transferred, whether voluntarily, involuntarily or by operation of law (including, without limitation, the laws of bankruptcy . . . ), all or any of the Shares now owned or acquired after the date of this Agreement by such Shareholder.  **No shares shall be transferred, nor shall any transfer be effective, unless and until there is full compliance with the terms of this Agreement . . .**

Art. I(A) (emphasis added).  The Shareholders' Agreement further provides that:

> [i]f a Shareholder desires to sell or in any manner to dispose of or otherwise transfer all or any portion of his Shares during his lifetime, then [he] shall offer for sale such Shares . . . to the Corporation and the other Shareholders at a purchase price set forth in <u>Schedule A</u> of the Agreement, and upon the terms set forth in Article IV.

---

that the current shareholders of the professional corporation include those referenced in the more recently dated version, the Court finds that the Second Amended and Restated Shareholder Agreement is the version currently in effect.  Accordingly, the Court's use of the term "Shareholders' Agreement" specifically refers to the Second Amended and Restated Shareholder Agreement dated July 1, 2011.  The Court notes that the existence of more than one version of the shareholder agreement is inconsequential because the pertinent language concerning transfers of stock, including the formula used to calculate the purchase price, is essentially the same in both versions.

Art. II(A).  The Shareholders' Agreement entitles the Corporation to a first right of refusal but, in the event that all of the shares being offered are not purchased by the Corporation, the other shareholders "**shall be obligated to purchase** and the Offering Shareholder shall be obligated to sell all of such remaining Shares at such purchase price and upon such terms."  Art. II(A), §§ 1, 2 (emphasis added).

Article IV of the Shareholders' Agreement provides that the purchaser of shares may make payment by cash, by promissory note or by a combination of the two. Schedule A of the Shareholders' Agreement includes the formula for determining the purchase price for the shares, which is the same formula applied by Mr. Raymond in valuing the buyout or "absolute floor" that Dr. Cole would be able to obtain from other shareholders.  According to the Shareholders' Agreement, in the event the Corporation were to exercise its first right of refusal, the same formula for determining the purchase price of the shares would be utilized.

In his bankruptcy schedules (Ex. 3), Dr. Cole values his interest in the dental practice at $15,782.[11]  He lists no real estate.  He lists the total value of his personal property at $159,231, and he claims exemptions in property in the amount of $99,732.

The schedules include Dr. Cole's chapter 13 "Statement of Your Current Monthly Income and Calculation of Commitment Period" (Official Form 22C-1).  On Form 22C-1,  Dr. Cole lists his average monthly income and his current monthly income at $12,500. Because his current monthly income for the year exceeds the applicable median family income, the required commitment period as calculated under § 1325(b)(4)(A) is 5 years.

---

[11] This amount corresponds to the September 30, 2013, value offered in the Circuit Court by Dean Heinberg.

On the expense portion of Form 22C-1, Dr. Cole includes transportation expenses and the vehicle ownership expense for one vehicle, a 2012 Ford Focus.  By the date of the hearing on November 10,  the debt secured by this vehicle had been paid off.  Dr. Cole also listed $2779 as the amount of his monthly tax obligation.  After deducting all amounts "allowed under 11 U.S.C. § 707(b)(2)(A)," Dr. Cole's monthly disposable income under § 1325(b)(2) came to $108.83 on Form 22C-1.

## Law

### *Objection to Confirmation*

Pursuant to Bankruptcy Rule 3015(f), an objection to confirmation of a chapter 13 plan is a contested matter and is governed by Rule 9014.  The objecting party has the burden of going forward with the evidence, but the Debtor bears the ultimate burden of proof.  *In re Faison*, 416 B.R. 227, 229 (Bankr. E.D. Va. 2008).

### *A.  Best Interest of Creditors Test*

Ms. Cole contends that the Plan should not be confirmed because it fails to comply with the statutory requirements for confirmation set forth in §§ 1322(a) and 1325.  One of the specific deficiencies asserted by Ms. Cole is the Plan's failure to comply with § 1325(a)(4), commonly known as "the best interests of creditors test" or "the liquidation test," which states:

> (a) Except as provided in subsection (b), the court shall confirm a plan if—
> . . . (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date . . . .

The liquidation test requires that creditors receive payments having a present value at least equal to what they would receive in a chapter 7 case. *In re Plascencia*, 354 B.R. 774, 782 (Bankr. E.D. Va. 2006).

In order to determine whether a proposed chapter 13 plan meets the liquidation test, two separate calculations are necessary. One calculation determines the value, as of the effective date of the plan,[12] of property to be distributed to each unsecured creditor under the proposed chapter 13 plan, taking into account the associated administrative expenses. The next calculation establishes the amount that would be paid to each unsecured creditor if the debtor's estate were liquidated in a hypothetical chapter 7 case, taking into account chapter 7 administrative expenses. *In re Keenan*, 364 B.R. 786, 802 (Bankr. N.M. 2007).

In this case, not including Ms. Cole's Claim, unsecured claims total $69,544.75. Her Claim is in the total amount of $132,969, of which the Debtor contends $119,969 is a general unsecured claim. Assuming for purposes of this analysis that the Debtor's contention is correct, the amount of unsecured claims would total $189,513.75.

The proposed funding of the Plan totals $66,000, to be paid to the Trustee in equal installments of $1100 per month for 60 months. This amount would be further reduced

---

[12] Courts have differed in deciding the meaning of the phrase "effective date of the plan" for purposes of applying the best interests of creditors test, with some performing the hypothetical liquidation as of the date of the chapter 13 petition and others the date of confirmation or the confirmation hearing date. *See In re Keenan*, 364 B.R. 786, 802-03 (Bankr. N.M. 2007) (recognizing the disagreement and using the petition date, which the parties had "in effect agreed on . . . ."); *In re Minahan*, 394 B.R. 116, 131-32 (Bankr. W.D. Va. 2008) (effective date of plan for purposes of Section 1325(b)(1) is the date of final hearing on plan confirmation) (citing *In re Allen*, 240 B.R. 231, 237-38 (Bankr. W.D. Va. 1999)). The parties here have proceeded as if the effective date is the petition date. The record is insufficient to enable the Court to discern any meaningful difference in the outcome regardless of whether the effective date is the petition date or date of confirmation. Therefore, the Court has used the petition date as the effective date in arriving at its ruling.

by the trustee's commission of 10% ($6600), attorney's fees ($4600), and the proposed

priority claim to Ms. Cole ($13,000). This would leave a total of $41,800 to be paid to

unsecured creditors in Dr. Cole's chapter 13 case. Without accounting for present value

of future payments,[13] this would result in a distribution of approximately 22% of

unsecured claims. This is the amount that the Court must use to determine whether under

the Plan the unsecured creditors in this chapter 13 case will receive as much as they

would receive in a chapter 7 liquidation. The parties agree that the answer to this

question depends primarily on the value of Dr. Cole's interest in the Practice.

Ms. Cole contends that the value of Dr. Cole's interest in the Practice is the value

that was determined by the Circuit Court in the divorce proceedings. She argues that the

principle of collateral estoppel bars the Debtor from relitigating the value of his interest

and requires this Court to find that the value is $212,000. Alternatively, Ms. Cole asserts

that the "going concern" value of Dr. Cole's interest which according to her evidence, is

$212,000 (or Mr. Raymond's more recent estimate of $203,000), is the appropriate

measure of value for purposes of applying the liquidation test.

The Debtor maintains that collateral estoppel does not apply because the "intrinsic

value" of his business interest, as determined by the Circuit Court, is not the same as the

chapter 7 liquidation value contemplated under § 1325(a)(4). He points to various

impediments that would adversely affect a chapter 7 trustee's ability to liquidate his

interest, many of which are attributable to the difficulties associated with successfully

marketing a minority interest in a personal services corporation. The Debtor places

---

[13] In order to calculate the present value of a stream of future payments, which would normally be
necessary in order to accurately compare the proposed distribution to a hypothetical chapter 7
liquidation, a mathematical formula utilizing a discount rate must be applied. *In re Plascencia*,
354 B.R. 774, 782 (Bankr. E.D. Va. 2006).

substantial weight on the testimony of Mr. Matson, who stated that he would have abandoned the Debtor's interest in the Practice if he were the chapter 7 trustee in this case.  The Debtor argues that Mr. Matson's testimony that no one would pay anything in the open market for that 25% interest conclusively establishes that his interest in the Practice would have no value in a chapter 7 liquidation.

The doctrine of collateral estoppel, or "issue preclusion," prohibits the relitigation of an issue of fact in a different cause of action by a party where that party had a full and fair opportunity to litigate the issue in a previous case.  *Johnson v. Stemple* (*In re Stemple*), 361 B.R. 778, 794-95 (Bankr. E.D. Va. 2007).  A party seeking to assert collateral estoppel must establish:

> (1) that "the issue sought to be precluded is identical to one previously litigated" ("element one"); (2) that the issue was actually determined in the prior proceeding ("element two"); (3) that the issue's determination was "a critical and necessary part of the decision in the prior proceeding" ("element three"); (4) that the prior judgment is final and valid ("element four"); and (5) that the party against whom collateral estoppel is asserted "had a full and fair opportunity to litigate the issue in the previous forum" ("element five"). *Sedlack v. Braswell Servs. Group, Inc.,* 134 F.3d 219, 224 (4th Cir.1998).

*Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 217 (4th Cir. 2006).  According to Dr. Cole, the necessary elements to establish collateral estoppel are not present.  In particular, he claims that the issue determined in the prior proceeding (the "intrinsic value" of the Debtor's interest in the Practice) is not the same as the present issue (the "liquidation value" of the interest).

Equitable distribution proceedings in Virginia require the trial court to determine the ownership and value of the parties' property.  Va. Code Ann. § 20-107.3(A).  The definition of "value" for equitable distribution purposes is "that value which represents

the property's intrinsic worth" to the parties. *Wright v. Wright*, 737 S.E.2d 519, 531 (Va. Ct. App. 2013) (quoting *Bosserman v. Bosserman*, 384 S.E.2d 104, 107 (Va. Ct. App. 1989)). "Intrinsic value is a very subjective concept that looks to the worth of the property **to the parties**." *Howell v. Howell*, 523 S.E.2d 514, 517 (Va. Ct. App. 2000) (emphasis added). The valuation offered by Mr. Raymond in the equitable distribution proceedings (Ex. 7), and which was adopted by the Circuit Court, established the value of Dr. Cole's interest in the Practice to Dr. Cole and Ms. Cole.[14] The Circuit Court utilized this value to make a monetary award pursuant to Va. Code Ann. § 20-107.3.

By contrast, in the instant proceeding, the Court must determine the value of Dr. Cole's interest in the Practice in the context of a hypothetical chapter 7 liquidation. Section 704(a)(1) of the Bankruptcy Code requires a chapter 7 trustee to reduce to money the property of the bankruptcy estate, clearly contemplating a sale or other disposition of the property. This is different from determining the intrinsic value, or its worth to the parties, in a divorce proceeding.

In the marital dissolution proceedings, the amount a chapter 7 trustee would receive by liquidating the Debtor's interest in the Practice was not the basis for establishing its value. Accordingly, the issue decided by the Circuit Court is not the same as the issue before this Court. For that reason, collateral estoppel does not apply.

---

[14] Mr. Raymond's report describes the standard of value, or type of value being provided, as that set forth in *Howell v. Howell*, 523 S.E.2d 514, 517 (Va. Ct. App. 2000), which rejects the application of fair market value in favor of an intrinsic standard that considers the owner's current use of the business interest, his current resources, and his ability to economically exploit the interest. (Ex. 7 at 2-3).

Ms. Cole next argues that notwithstanding the application of the collateral estoppel doctrine, Mr. Raymond's estimate of value[15] should be applied in determining the value of the Debtor's interest in the Practice because it represents the "only viable and accurate assessment" of value.  (Proposed findings, Docket 44, p. 19).  Mr. Raymond's valuation assigns considerable value to ongoing patient relationships and goodwill.  Ms. Cole contends that this "going concern" value is the appropriate standard for valuing a business interest, *id.* at15, and cites the decisions of *In re Baker*, No 95-30947 HCD, 1996 WL 571764 (Bankr. N.D. Ind. July 2, 1996), and *In re Health Diagnostic Laboratory, Inc.,* No. 15-32919 (Bankr. E.D. Va. Aug. 17, 2015) (Docket 405), in support of her position.  Neither case, however, is applicable here.

*Baker* involved a secured creditor's objection to confirmation of a chapter 13 plan pursuant to  § 1325(a)(5).  The debtors in that case had a dental practice that they proposed to continue operating during the course of their case.  The court ruled that going concern value should be used for the purpose of valuing the creditor's security interest in the practice and that employing a forced sale or liquidation value would be inappropriate. 1996 WL 571764, at *6.

The court in *Health Diagnostic Laboratory* applied a going concern value in a chapter 11 case to find that a secured creditor was adequately protected under § 364(d)(1)(B) of the Bankruptcy Code where there was no evidence that the debtor intended to liquidate the business.  "No evidence was presented to suggest that the

---

[15] Mr. Raymond's valuation of $212,000 as of September 30, 2013 (Ex. 7), which was adopted by the Circuit Court, was updated for these proceedings, resulting in an estimate of $203,000 as of December 31, 2014.  (Ex. 15).  The updated estimate was based on more recent financial information that was substituted in the computation originally used to establish the "intrinsic value" of the Debtor's interest in the Practice.  (Tr. at 92-93).  The revised valuation thus remains an estimate of the "intrinsic value" as adopted by the Circuit Court.

Debtors are close to liquidation and, as such, liquidation value (either as orderly liquidation value or forced liquidation value) is not appropriate to value the Debtors' assets. To the contrary, the evidence presented to the Court . . . indicated that the Debtors would remain a going concern as the Debtors pursue the going concern sale of their assets." *Id*. at 18. The court adopted the Debtors' proposed fair market valuation that was based on a negotiated sale with ongoing operations and, using that valuation, found that an equity cushion existed. *Id.* at 21-25.

As Judge Huennekens stated in *Health Diagnostic Laboratory*, "[p]roperty valuations in bankruptcy are 'determined in light of the purpose of the valuation and of the proposed disposition or use of such property.'" *Id*. at 17 (quoting *Estate Constr. Co. v. Miller & Smith Holding Co.,* 14 F.3d 213, 219 (4th Cir. 1994)). Neither the purpose of the valuation in this case, nor the proposed disposition, is the same as in the cases cited by Ms. Cole.

In this case, Mr. Raymond's valuation (Ex. 7, Ex. 15) is based on the going concern value of the dental practice as a whole, taking 25% of that total. (Tr. at 79, ll.17-23). But there is nothing in the Shareholder's Agreement nor any other evidence in the record to suggest that Dr. Cole, or a chapter 7 trustee stepping into his shoes, would have the ability to force a sale of the Practice as a going concern in order to maximize Dr. Cole's 25% interest in the proceeds. Both *Baker* and *Health Diagnostic Laboratory* involved circumstances in which a debtor owned and controlled a full interest in an ongoing business. By contrast, a hypothetical chapter 7 trustee would have only the rights held by Dr. Cole as a minority shareholder in the Practice.[16] Moreover, the values

---

[16] Interests held by a debtor in a business entity, such as stock in a corporation, are included in the bankruptcy estate. *In re Liber*, No. 08-37046, 2012 WL 1835164, at *2 (Bankr. N.D. Ohio, May

utilized in *Baker* and *Health Diagnostic Laboratory Laboratory* dealt with the rights of a secured creditor and did not involve the disposition of property in a hypothetical chapter 7 liquidation.

Dr. Cole asserts that the valuation espoused by Mr. Heinberg, which places no value on Dr. Cole's interest in the Practice, is the appropriate measure of value.[17]  He cites the cases of *In re Faison*, 416 B.R. 227 (Bankr. E.D. Va. 2008) and *Williams v. Swimelar*, No. 6:07-CV-90, 2008 WL 1805824 (N.D.N.Y. Apr. 18, 2008), *aff'g In re Williams*, 354 B.R. 604 (Bankr. N.D.N.Y. 2006), to support his argument that a chapter 7 trustee's inability to benefit from a debtor's future services or to prohibit him from competing with a buyer[18] renders the interest valueless.

The Court finds *Faison* to be inapposite to the current case.  The court in *Faison* was asked to find that a chapter 13 debtor's interest in a partnership, a mortgage

---

18, 2012) ("A trustee's interest in a debtor's property . . . does not ordinarily extend beyond those prepetition interests held by a debtor, a situation which has been described euphemistically as the trustee stepping into the shoes of the debtor." *Id.* at *3).  *See also Beaman v. Shearin (In re Shearin)*, 224 F.3d 346, 349 (4th Cir. 2000); *Swartz v. Billingsley (In re Billingsley)*, 338 B.R. 372 (Bankr. C.D. Ill, 2006); *Sheehan v. Warner (In re Warner)*, 480 B.R. 641, 656-57 (Bankr. N.D. W. Va. 2012).

Courts look to state law when determining a debtor's interest in property.  *Butner v. United States,* 440 U.S. 48, 54 (1979).  The Shareholders' Agreement defines the Practice as a Virginia Professional Corporation, as do all related exhibits; therefore, Virginia corporate law applies.  While Section 13.1-747 of the Code of Virginia, Va. Code Ann. § 13.1-747, allows for judicial dissolution as a result of oppressive and fraudulent conduct by the majority shareholders, *see, e.g., Colgate v. The Disthene Group, Inc*., No. CL-11-117, 2012 WL 9391675, at *4 (Va. Cir. Ct. August 30, 2012), there is nothing in the record to suggest that such circumstances are present in this case.  Moreover, a chapter 7 trustee attempting to compel a sale of the Practice pursuant to § 363(h) of the Bankruptcy Code would likely encounter opposition from the other shareholders. *See, e.g., Horizons A Far, LLC, v. Webber* (*In re Soderstrom*), 484 B.R. 874 (M.D. Fla. 2013); *Schwab v. Stroup (In re Stroup)*, 521 B.R. 84 (Bankr. M.D. Pa. 2014).

[17] Even though Mr. Raymond's valuation might be rejected to the extent it relies on the perhaps erroneous assumption that a chapter 7 trustee would be able maximize Dr. Cole's 25% interest by forcing a sale of the Practice as a going concern, Mr. Heinberg's failure to attribute any value whatsoever to the patient records or goodwill of the Practice (Ex. P at 5) fatally flaws his opinion of value.

[18] The Court notes that ¶ 9 of Dr. Cole's employment agreement (Ex. 5) includes a non-compete and a non-solicitation provision.

brokerage business, was properly valued at one dollar for purposes of applying the §

1325(a)(4) liquidation test.   The court found that the debtor's interest was limited to the

income he generated for services performed and that, without the debtor, his ownership

interest in the partnership would have no value "and certainly no value that a Chapter 7

trustee would be able to realize on behalf of the estate."  *Id*. at 229.

Section 541(a) of the Bankruptcy Code defines property of the bankruptcy estate,

but subsection (a)(6) specifically excludes from property of the estate "earnings from

services performed by an individual debtor after commencement of the case."  Therefore,

Dr. Cole's postpetition earnings would not be a part of a chapter 7 bankruptcy estate.  *See*

*Ackerman v. Schultz* (*In re Schultz*), 250 B.R. 22, 35 (Bankr. E.D.N.Y. 2000).

Nevertheless, Dr. Cole's interest in the Practice is not limited to the income he may

generate for future services.  As stated in *Ackerman v. Schultz*:

> [T]the value of a professional practice owned by a debtor as of the
> commencement of a bankruptcy case is attributable to many
> different assets; e.g., some of its value flows from the practice's
> physical assets, such as equipment; some of the practice's future
> cash flow may be attributable to the professional's human capital,
> such as his skills and labor; and some of its value may derive from
> the practice's intangible assets, such as goodwill. . . .  Goodwill
> includes the practice's name recognition, consumer brand loyalty,
> or special relationships with suppliers or clients. Additionally, it is
> settled law in New York that professional goodwill, which is
> comprised of other than personal attributes of a professional
> person, such as continuity of location and continuity of the name of
> a professional practice, is a saleable asset which attaches to the
> place, not the person, and survives even the death of that
> professional person.

*Id*. (citation omitted).  Even taking into consideration the diminution in value attributable

to Dr. Cole's non-controlling interest and potential refusal to enter into an agreement not

to compete in connection with a transfer, unlike the debtor in *Faison*, his interest has

value in the form of the Practice's invested capital, accounts receivable, goodwill, employment contracts with staff, and patient relationships, all of which are part of the bankruptcy estate.  *See id.* at 36.  *See also In re Prince*, 85 F.3d 314, 322 (7th Cir. 1996)*; In re Thomas*, 231 B.R. 581 (Bankr. E.D. Pa. 1999), *aff'd sub nom. Thomas v. United States* (*In re Thomas*), 246 B.R. 500 (E.D. Pa. 2000).

Dr. Cole's reliance on *Williams v. Swimelar* is similarly misplaced.  There, the district court, relying heavily on the bankruptcy court's opinion, affirmed the denial of confirmation of a debtor's amended chapter 13 plan due to the debtor's failure to establish compliance with the liquidation test of § 1325(a)(4).  The bankruptcy court's opinion, *In re Williams*, 354 B.R. 604 (Bankr. N.D.N.Y. 2006), addressed the value of a debtor's ownership interest in an insurance agency, which the debtor had listed as having no market value.  The debtor argued that the business could only be run by someone licensed to sell insurance and that a chapter 7 trustee, who was unlikely to be licensed, could not force the debtor to service the customers' accounts.  He also asserted that he could not be compelled to enter into a covenant not to compete and that the insurance companies would likely terminate their agreements with the agency.  The bankruptcy court rejected the debtor's contention that the insurance agency had no value, noting that at least some insurance companies may choose not to terminate their relationship with the agency and that a chapter 7 trustee could employ an insurance agent to operate the business while the trustee marketed it.  *Id.* at 610-11.  The bankruptcy court found that the debtor had not met his burden to establish that the insurance agency had no value.

> The Court recognizes that factors exist that would make it difficult, but certainly not impossible, for a chapter 7 trustee to sell the Agency for a reasonable price.  However, this is not a chapter 7.  It is a chapter 13, and Code § 1325(a)(4) requires only that the Court

consider the value of the Debtor's nonexempt assets in the context of a *hypothetical* chapter 7 case.  As noted previously, it was the Debtor's burden to establish to the satisfaction of the Court that the Agency was only worth "0."

*Id*. at 611.

When the burden is on the debtor to establish that an asset has no value in order to demonstrate compliance with § 1325(a)(4), he must do more than list the impediments a chapter 7 trustee would encounter while attempting to liquidate the asset, even if the impediments would lead to the belief that some trustees would forego the effort, particularly where there is evidence to suggest that the asset has more than a nominal value.  In this case, there is evidence suggesting that Dr. Cole's interest in the Practice would have significant value in a chapter 7 liquidation.  The Shareholders' Agreement corroborates Mr. Raymond's testimony that Dr. Cole is entitled to compel the other shareholders of the Practice to buy out his interest for a set price.  The Shareholders' Agreement provides that "if a Shareholder desires to sell or in any manner to dispose of or otherwise transfer all or any portion of his Shares during his lifetime " he must first offer the shares to the Corporation and then, if the Corporation does not purchase the shares, to the other shareholders, who "shall be obligated to purchase" the shares.  The price to be paid by either the Corporation or the other shareholders is determined by a formula set forth in the Shareholders' Agreement.  Mr. Raymond's uncontroverted testimony is that as of December 31, 2014, the price would be $161,268 using the formula in the Shareholders' Agreement.

A chapter 7 trustee, who would inure to the rights of Dr. Cole as a shareholder of the Practice, would be entitled to demand that the other shareholders (if not the Corporation) purchase Dr. Cole's shares in exchange for the sum of $161,268.  Dr. Cole

has offered no evidence to rebut the availability of the buyout to a chapter 7 trustee[19] nor

has he offered his own evidence of its value.[20]   The Court recognizes that "[d]etermining

how a theoretical chapter 7 case would turn out and how much the creditors would

receive obviously requires the adoption of a number of assumptions and inherently is

somewhat speculative."  *In re Sauter*, No. 08-72050, pp. 5-6 (Bankr. W.D. Va. February

11, 2009).  Nevertheless, in this case, there has been no evidence presented that would

cause the Court to conclude that a chapter 7 trustee would recover anything less than the

amount required to be paid under the buyout provision of the Shareholders' Agreement.

Therefore, for the purpose of applying the chapter 7 liquidation analysis under

§ 1325(a)(4), the Court will value the Debtor's interest in the Practice at $161,268.

The general rule is that the liquidation value of the assets available in a chapter 7

case less the associated costs, including the trustee's fees, costs of sale, exemptions and

capital gains taxes, should be used when determining whether a chapter 13 plan satisfies

the calculation required under § 1325(a)(4).  *In re Delbrugge*, 347 B.R. 536, 539 (Bankr.

---

[19] The possible import of 11 U.S.C. § 365 on a chapter 7 trustee's rights under the Shareholders' Agreement has not been raised and therefore need not be addressed.

[20] At the November 10 evidentiary hearing, Mr. Heinberg offered no testimony regarding the Shareholders' Agreement or the purchase price for the shares in the event of a buyout.  His sole reference to the value of the buyout provision in his valuation reports (Ex.'s P, I and J) was to reject Mr. Raymond's contention that the Shareholders' Agreement establishes a "floor value" due to the assumption that the buyout may only be triggered by Dr. Cole's resignation.  The Court finds nothing in the Shareholders' Agreement that requires that Dr. Cole resign his employment. Additionally, Mr. Matson testified that if he were the chapter 7 trustee administering Dr. Cole's interest in the Practice, he would abandon it as an asset of the estate "because I don't think there's anyone who would pay anything in the open market, for that twenty-five percent interest."  (Tr. at 41, ll. 18-24).  He acknowledged having reviewed the Shareholders' Agreement but offered no testimony as to why he would be unable to realize any value in exchange for Dr. Cole's shares pursuant to its buyout provisions.  Moreover, Mr. Matson's testimony that he would abandon Dr. Cole's interest does not conclusively establish a lack of value in a hypothetical chapter 7 case. Bankruptcy Rule 6007(a) requires a trustee to give notice of a proposed abandonment or disposition of property and requires the Court to conduct a hearing in the event an objection is filed.  It is a reasonable assumption that Ms. Cole would object to a proposed abandonment of Dr. Cole's interest in the Practice, whereupon the trustee would be obligated to offer a satisfactory explanation for the abandonment.

N.D. W. Va. 2006).  In the instant case, the record enables the Court to determine the

amount of the Debtor's exemptions, and § 326(a) sets forth the means by which the Court

may calculate the maximum commission available to a chapter 7 trustee.  However, there

is nothing to guide the Court in determining other potential liquidation costs, such as

sales expenses,[21] attorney's fees, and tax obligations that may be incurred, and the Court

will not engage in speculation.

The Debtor listed no interest in real estate and listed the value of his personal

property at $159,231.  Other than his interest in the Practice, the value of the Debtor's

assets is not in dispute.  The Court has valued the Debtor's interest in the Practice at

$161,268, which exceeds his scheduled valuation of $15,782 by $145,486.  Therefore, the

total value of the Debtor's assets is $304,717.  The Debtor has claimed and is entitled to

exemptions in the amount of $99,732, which would leave $204,985 in assets available to

be administered in a chapter 7 case.

Under §326(a), a chapter 7 trustee would be entitled to a maximum commission

of $13,499.25 upon disbursing $204,985 to parties in interest. [22] Assuming the trustee

receives the maximum allowed commission, $191,485.75 would be available to be paid

to creditors.

When determining the amount to be paid to unsecured creditors under the

Debtor's chapter 13 Plan, the Court has accepted, for that limited purpose only, the

Debtor's assertion that Ms. Cole's priority claim is limited to $13,000.  Subtracting that

---

[21] While it is reasonable to assume that a chapter 7 trustee might, in some cases, incur fees and expenses associated with the employment of a sales agent, such assistance would not be necessary in connection with exercising a buyout pursuant to the Shareholders' Agreement.

[22] Section 326 limits chapter 7 trustee fees to 25% of the first $5000, 10% of amounts from $5000 to $50,000, and 5% of amounts in excess of $5000.  There is a decreased percentage at higher levels that is not relevant to this case.

sum from the $191,485.75 available to pay all creditors in a hypothetical chapter 7

liquidation leaves $178,485.75 to pay the remaining creditors.

When evaluating the Plan, the Court has calculated that general, unsecured claims

total $189,513.75.  In a chapter 7 case, payment of $178,485.75 to those creditors would

constitute a distribution of 94% of their claims.  However, in this chapter 13 case, the

Plan proposed by the Debtor would distribute a total of only $41,800 to general,

unsecured creditors, which amounts to a distribution of 22% of their claims.  Therefore,

the Debtor has failed to establish that the Plan complies with § 1325(a)(4).  The Court

will deny confirmation  and grant the Debtor leave to file an amended Plan.

### B.  Good Faith

At confirmation, the Debtor has the burden of proving that both the case and the

Plan were filed in good faith.  *In re Colston,* 539 B.R. 738, 746 (Bankr. W.D. Va. 2015)

(citing *Ellsworth v. Lifescape Med. Assocs., P.C. (In re Ellsworth)*, 455 B.R. 904, 918

(B.A.P. 9th Cir. 2011)).  Ms. Cole contends that Dr. Cole has not proceeded in good faith,

both in the filing of his petition and in the filing of his Plan.

The Fourth Circuit applies a totality of the circumstances test to determine

whether a chapter 13 plan has been proposed in good faith pursuant to § 1325(a)(3).  *In re*

*Colston,* 539 B.R. at 747; *Solomon v. Cosby* (*In re Solomon)*, 67 F.3d 1128, 1134 (4th

Cir. 1995); *Deans v. O'Donnell,* 692 F.2d 968 (4th Cir. 1982).  The court must consider

various factors including, but not limited to, the following: the proposed distribution to

unsecured creditors, the nature and amount of unsecured claims, the debtor's prepetition

and postpetition conduct, and whether the debts would be dischargeable in a chapter 7

bankruptcy.  *In re Colston,* 539 B.R. at 747.

A number of factors, including the timing of Dr. Cole's bankruptcy filing, his inability to discharge any part of Ms. Cole's claim in a chapter 7, the absence of any significant creditors other than Ms. Cole and Dr. Cole's parents, and the limited proposed distribution to Ms. Cole, seem to support Ms. Cole's argument that Dr. Cole has failed to meet his burden of establishing that the Plan is proposed in good faith.  The Court, however, has already denied confirmation of the Plan.  And while the issue of good faith may continue to be an issue should Dr. Cole choose to file an amended plan, at least some factors may change as a result of the modifications Dr. Cole would be required to implement in order to comply with the Court's ruling.  Therefore, the Court will not rule at this time on the good faith of this Plan.

Ms. Cole has also objected to confirmation under § 1325(a)(7), which provides that a plan may not be confirmed unless a debtor proves, by a preponderance of the evidence, good faith in the filing of his chapter 13 petition.  *In re Colston*, 539 B.R. at 750.  The factors considered by courts when determining whether a petition was filed in good faith have usually focused on whether, under the circumstances of the case, there has been an abuse of the bankruptcy process.  *See, e.g., In re Uzaldin*, 418 B.R 166, 173 (Bankr. E.D. Va. 2009); *In re Colston,*539 B.R. at 750-51.[23]  Again, there are factors in this case that would suggest that the petition was not filed in good faith;[24] however,

---

[23] A party seeking to dismiss a debtor's case under § 1307(c) bears the burden of proving a debtor's bad faith.  *In re Page*, 519 B.R. 908, 913 (Bankr. M.D.N.C. 2014) (citing *In re Love*, 957 F. 2d 1350, 1355 (7th Cir. 1992)).  Courts have considered the standards applicable to a § 1307(c) analysis when determining what a debtor must prove to obtain confirmation under § 1325(a)(7), though the appropriate remedy is to deny confirmation when the debtor has failed to carry his burden of proving that the chapter 13 petition was filed in good faith.  *In re Colston,* 539 B.R. 738, 752 (Bankr. W.D. Va. 2015).

[24] Aside from the Letter Opinion, most of the evidence is circumstantial.  Neither party offered evidence directly related to the Debtor's motives for filing the petition.

because the Court has denied confirmation of the Plan for other reasons, it need not make a determination under § 1325(a)(7).

### C. Disposable Income

Both Ms. Cole and the Trustee objected to confirmation on the basis of the disposable income requirements of § 1325(b).  The issues in contention involve an expense of $330 per month for a car payment, the Debtor's alleged overestimation of his monthly income tax obligation, and the Debtor's alleged "voluntary underemployment."

Under § 1325(b)(4)(A)(ii), Dr. Cole is required to pay his projected disposable income[25] into the plan for 60 months, unless claims could be paid in full in a shorter period.  Dr. Cole's Form 22C-1 lists his monthly disposable income at $108.83.  The Plan proposes payments of $1100 per month for a total of 60 months.

Ms. Cole contends that Dr. Cole's calculation of monthly disposable income is incorrect, arguing that the amount listed for his monthly tax expense fails to account for allowed deductions attributable to spousal support payments.[26]  She submitted an exhibit prepared by Mr. Raymond (Ex. 12) that purports to demonstrate that the net amount of spousal support payments, after subtracting the tax savings, is a figure substantially less than the gross amount paid.  This evidence, however, does not support Ms. Cole's contention that Dr. Cole has not properly accounted for his actual net monthly tax expense.

---

[25] Projected disposable income includes adjustments to monthly disposable income occasioned by changes in income or expenses that are known at the time of confirmation or are virtually certain to occur during the term of the plan.  *See Hamilton v. Lanning*, 560 U.S 505, 524 (2010).

[26] The Court is unable to discern whether Ms. Cole contends that the amount listed under Line 16 (Taxes) or Line 19 (Court-ordered payments) of Dr. Cole's Form 22C-1 is excessive.  The net effect of the proposed reduction under either line would have the same effect on Line 45, which is the figure for monthly disposable income under § 1325(b)(2).

Dr. Cole testified that his 2014 individual federal tax return included a deduction of $50,000 attributable to his payment of spousal support. (Tr. at 46, ll. 18-22). His 2014 federal and state tax returns corroborate this testimony. (Ex. F). Dr. Cole's further testimony concerning the amounts listed for federal and state income taxes and FICA, based on his adjusted gross income after deducting "alimony paid," is also corroborated by his 2014 tax returns. Therefore, the reduction in Dr. Cole's monthly tax obligation resulting from his ability to exclude spousal support from his gross income is properly reflected in Form 22C-1, and the amount listed under Line 16 for Taxes is substantially correct.[27] Neither Ms. Cole nor the Trustee has offered any persuasive evidence or reason to question that this is the case.

Ms. Cole's assertion that Dr. Cole is able to increase his payments by an additional $330 per month as a result of his having fully paid a debt secured by his automobile, notwithstanding that the expense appears to have been properly taken on Lines 13-13c of Form 22C-1, is also of no consequence. *See In re Walker*, No. 07-70358, 2010 WL 4259274, at *9 (Bankr. C.D. Ill, Oct. 21, 2010) (the disposable income analysis adds nothing when its outcome would require payments totaling less than the amount necessary to satisfy the liquidation analysis). The Court's ruling in connection with the liquidation analysis will require an increase in plan funding significantly in excess of the amount that would be provided by an additional monthly payment of $330 for the remainder of the required 60 months. Since the Debtor is required to pay only the higher

---

[27] During oral argument, Dr. Cole admitted that at the time he prepared his Form 22C-1, he had not completed his 2014 tax returns; therefore, his monthly tax expense was estimated and based on 2014 earned income of approximately $145,000. (Tr. at 126, ll. 10-17). Despite his anticipated $5000 salary increase for 2015, it would appear that the amount listed for his monthly tax expense is essentially correct, with any necessary adjustment being inconsequential in light of the Court's ruling in connection with the best interests of creditors test.

of the two amounts, the Court need not consider an increase in projected disposable

income of only $330 per month.  *Id.* at *8.

Ms. Cole couches her contention that the Debtor is "voluntarily underemployed"

as the further failure of the Debtor to submit all of his disposable income toward funding

the Plan.  This allegation, that Dr. Cole has intentionally foregone the opportunity to earn

a higher salary, would be more appropriate to consider when deciding whether he has

complied with his good faith requirements under § 1325(a)(3) and (7).  *See In re Uzaldin*,

418 B.R. at 175-76.  As the Court has already stated, it is not necessary to rule on the

issue of Dr. Cole's good faith at this time.  Proof, if it exists, that Dr. Cole could, but

chooses not to, earn a higher income by working more hours, in the absence of any

evidence that he has manipulated or structured his income in order to lower the amount of

his current monthly income has little, if any, bearing on the amount of his disposable

income under § 1325(b)(2).

In order to determine a debtor's disposable income under § 1325(b)(2), the

debtor's current monthly income must first be calculated.  "Current monthly income" is

defined in § 101(10A)(A) as "the average monthly income . . . that the debtor receives . . .

during the 6-month period ending on . . . the last day of the calendar month immediately

preceding the date of the commencement of the case . . . ."  On Line 11 of Form 22C-1,

Dr. Cole lists this amount as $12,500.  Neither Ms. Cole nor the Trustee has challenged

the amount reflected on Line 11 of Dr. Cole's Form 22C-1 or otherwise contended that

the figure is misrepresented or incorrect.  In addition, neither party has offered any

evidence that Dr. Cole's income is virtually certain to increase during the term of the

Plan, which might require an adjustment when calculating his projected disposable

income. *See Hamilton v. Lanning,* 560 U.S. 505, 524 (2010).[28]  The scant evidence that

Ms. Cole's has offered to support her contention that Dr. Cole is "voluntarily

underemployed" is insufficient to successfully challenge Dr. Cole's compliance with §

1325(b)(2).

### *Debtor's Objection to Ms. Cole's Proof of Claim*

Ms. Cole has filed a proof of claim in the amount of $132,969, claiming that the

entire amount is entitled to priority under § 507(a) of the Bankruptcy Code.  The parties

now agree that $13,000 of the Claim represents unpaid spousal support and should be

allowed as a priority claim under § 507(a)(1).  The parties also agree that $69,969 of the

Claim represents an equitable distribution award and should be allowed as a general

unsecured claim.  The parties do not agree on how the remaining portion of the Claim

should be classified.

The remaining component of the Claim is in the amount of $50,000 and

represents the balance of attorney's fees awarded to Ms. Cole in connection with state

court divorce proceedings.  Although they disagree as to the classification of this portion

of the Claim, the parties agree that the amount asserted is correct.  Dr. Cole contends that

the attorney's fees award is not a domestic support obligation as defined by § 101(14A)[29]

and therefore should be allowed only as a general unsecured claim.  Ms. Cole maintains

that the attorney's fees are a domestic support obligation under § 101(14A) entitled to

---

[28] A substantial postpetition increase in income may be a basis to seek a modification of the Plan
pursuant to 11 U.S.C. § 1329(a).  *See Murphy v. O'Donnell (In re Murphy)*, 474 F.3d 143, 152
(4th Cir. 2007).

[29] The Bankruptcy Code defines the term "domestic support obligation" as a debt that is "owed to
. . . a spouse, former spouse, or child of the debtor . . . in the nature of alimony, maintenance or
support . . . of such spouse, former spouse, or child of the debtor . . . without regard to whether
such debt is expressly so designated . . . established . . . by reason of applicable provisions of – a
separation agreement, divorce decree, or property settlement agreement . . . ."  11 U.S.C. §
101(14A).

priority under § 507(a)(1)(A); therefore, she argues, they must be fully funded by the

Plan pursuant to § 1322(a)(2).  Consequently, the Court must determine whether the

attorney's fees award is in the nature of alimony, maintenance, or support constituting a

domestic support obligation pursuant to the definition in § 101(14A)(B).[30]

In chapter 13 bankruptcies, debts for domestic support obligations are excepted

from discharge.  11 U.S.C. § 1328(a)(2); 11 U.S.C. § 523(a)(5).  Cases addressing

whether a debt should be discharged under § 523(a)(5) are often useful when a court is

determining whether a debt is entitled to priority under § 507(a)(1)(A) because both

provisions require the court to determine whether a debt is a domestic support obligation.

*Compare In re Taylor*, 252 B.R. 346, 352 (Bankr. E.D. Va., 1999) (objection to

confirmation) with *Pagels v. Pagels (In re Pagels),* Adv. No. 10-07070-SCS, 2011 WL

577337, at *11-13 (Bankr. E.D. Va. 2011) (adversary proceeding under § 523(a)(5)).

Dr. Cole has submitted invoices and time entries from Ms. Cole's attorneys (Ex.

N) upon which the Circuit Court's award of attorney's fees is based.  He contends that

only those fees that Ms. Cole can prove were incurred in connection with support issues,

as opposed to those relating to equitable distribution, are nondischargeable.  Dr. Cole

---

[30] A proof of claim filed timely and in accordance with the Federal Rules of Bankruptcy
Procedure constitutes prima facie evidence of the validity and amount of the claim.  Fed. R.
Bankr. P. 3001(f).  Such a claim is deemed allowed unless a party in interest objects.  11 U.S.C.
§ 502(a).  The objecting party must present sufficient evidence to overcome the prima facie
validity of the claim.  *In re Smith*, 419 B.R. 622, 627 (Bankr. E.D. Va. 2008).  If sufficient
evidence is presented, the burden then shifts back to the creditor to prove the validity and amount
of its claim.  *Id*. at 628.  Dr. Cole has objected to the classification of the $50,000 attorney fee
award as a priority claim, arguing that this portion of Ms. Cole's claim is not in the nature of
support and therefore need not be paid in full.  Typically, the party opposing the discharge of a
debt pursuant to § 523(a)(5), or otherwise seeking a determination that an obligation is "actually
in the nature of alimony, maintenance or support," bears the burden of proof.  *Brunson v. Austin
(In re Austin),* 271 B.R. 97, 105 (Bankr. E.D. Va. 2001) (quoting *Tilley v. Jessee*, 789 F.2d 1074,
1077 (4th Cir. 1986)); *In re Taylor,* 252 B.R. 346, 352 (Bankr. E.D. Va. 1999).  In this case, the
burden rests upon Ms. Cole to prove that the award of attorney's fees is a domestic support
obligation.

claims that none of the attorney's fees are entitled to priority because Ms. Cole has failed to meet her burden of proving which fees are attributable to support issues.[31]

Dr. Cole's argument that only those fees for legal services that Ms. Cole can connect to the litigation of nondischargeable support are themselves nondischargeable ignores longstanding case law in this District.  This Court's opinion in *In re Taylor*, which is cited by Dr. Cole to support his position, states "that it is well within the province of the bankruptcy court to find a fee award to be in the nature of alimony, maintenance, or support even though the fee at issue was for services in the divorce litigation where both property and support were at issue." *In re Taylor*, 252 B.R. at 355 (citing *In re Grady*, 180 B.R. 461, 465 (Bankr. E.D. Va. 1995) ("(I)t is insignificant that the litigation addressed property awards as well as support.")).  In *Taylor*, the Court held that determining those attorney's fees that are "inextricably intertwined with the litigation of nondischargeable support" is but one analysis the Court may implement; the Court should also balance the function of the award and relative finances of the litigants.  252 B.R. at 353.  The Court further remarked that:

> Section 523(a)(5) "departs from the general policy of absolution or fresh start in order to 'enforce an overriding public policy favoring the enforcement of familial obligation.' " *Robb–Fulton v. Robb (In re Robb)*, 23 F.3d 895, 897 (4th Cir.1994) (quoting *Sampson v. Sampson (In re Sampson)*, 997 F.2d 717, 721 (10th Cir.1993)); *In re Roberson*, 187 B.R. at 163. The Fourth Circuit has observed that "[m]ost courts have classified an award of attorney fees in a divorce judgment as a nondischargeable debt in the category of alimony, maintenance, and support under § 523(a)(5)." *Silansky v. Brodsky, Greenblatt & Renehan (In re Silansky)*, 897 F.2d 743, 744 (4th Cir.1990); *accord Hirschler, Fleischer, Weinberg, Cox & Allen v. El–Amin (In re El–Amin)*, 145 B.R. 836, 838

---

[31] Ms. Cole testified that the proceedings in the Circuit Court were "very complex," involving two full days of testimony "about lots of things" including custody and support and that apportioning the time between support and property issues "was not [her] primary concern at the time."  (Tr. at 76-77).

(Bankr.E.D.Va.1991) ("Bankruptcy courts have usually found that attorney fees awarded on a spouse's behalf are nondischargeable support rather than property division.").

*Id.*

The determinative factor here is the intent of the Circuit Court. *Beaton v. Zerbe (In re Zerbe*), 161 B.R. 939, 941 (E.D. Va. 1994) ("In this circuit, the question of whether or not a debt is in the nature of alimony, support, or maintenance is largely a question of intent. . . .   In a case where a . . . judge. . . makes the decision that one party must pay the other's attorney's fees, it is the intention of the [judge], not of the parties, that controls."); *In re Grady,* 180 B.R. at 465 ("Since the issue at bar arises out of a clause in the divorce decree entered by a state court, we must look to the intent of the trier or [sic] fact with respect to those obligations.").

The Circuit Court's intent in awarding attorney's fees can best be ascertained from the Letter Opinion (Ex.1).[32]  The Circuit Court imposed fault for the divorce on Dr. Cole, noting that it was compounded by his dishonesty, and questioned the propriety of Ms. Cole having to "pay for necessary legal services to clean it up" when she was not at fault.  The Circuit Court also cited the inequality of the parties' financial resources, with Dr. Cole's earnings being four times that of Ms. Cole.  Moreover, it is clear that the Circuit Court was convinced that Dr. Cole's relative unwillingness to negotiate contributed to the expense of litigation.

---

[32] The Court may consider a variety of sources in order to ascertain the Circuit Court's intent "including pleadings, orders, transcripts, and the language of the divorce decree itself." *In re Grady,* 180 B.R. 461, 465 (Bankr. E.D. Va. 1995).  The final decree of divorce (Ex. 2) referred to the September 26, 2014 letter opinion as the basis for its award of attorney's fees to Ms. Cole. Ms. Cole initially offered into evidence a pleading submitted to the Circuit Court entitled Plaintiff's Memorandum on the Issues of Attorney's Fees and Costs (Ex. 11), which was withdrawn in response to Dr. Cole's objection.  Dr. Cole did not offer a similar exhibit; however, the Circuit Court referred to both parties' memoranda regarding attorney's fees as having been considered in the Letter Opinion.

The Court is unable to discern the extent to which the attorney's fees in question were related to property settlement or to support; nevertheless, there is a sufficient connection between the award of attorney's fees and the ascertainment of maintenance and support to find that the Circuit Court's fee award is in the nature of alimony, maintenance and support. *See In re Taylor*, 252 B.R. at 355. Furthermore, this Court is of the opinion that the Circuit Court intended that Dr. Cole pay the attorney's fees of Ms. Cole after due consideration of their respective assets and financial ability. *See In re Grady*, 180 B.R. at 465. Therefore, the Court finds that the $50,000 portion of Ms. Cole's Claim is a domestic support obligation under the language of § 523(a)(5) and is entitled to priority status under § 507(a)(1)(A).[33]

## <u>Conclusion</u>

The Objections to Confirmation of the Debtor's chapter 13 Plan filed by Ms. Cole and the Trustee are sustained. The Debtor will be granted leave to file an amended chapter 13 plan pursuant to Rule 3015-2(H)(3) of the Local Rules of the U.S. Bankruptcy Court for the Eastern District of Virginia.

The Debtor's Objection to Ms. Cole's Proof of Claim is sustained in part and overruled in part. Ms. Cole shall have an allowed proof of claim in the total amount of $132,969, of which $63,000 shall be entitled to priority pursuant to 11 U.S.C. § 507(a)(1)(A) and $69,969 shall be a general unsecured claim.

A separate order shall issue.

---

[33] The Court has already determined that the Plan should not be confirmed because it fails to comply with the requirements of § 1325(a)(4) and granted leave to the Debtor to file an amended plan. The failure of the Plan to comply with § 1322(a)(2) because it did not provide for full payment of Ms. Cole's priority claim must also be cured in order to obtain confirmation of an amended chapter 13 plan.

Entered: March 24, 2016                    _____/s/ Keith L. Phillips_____
                                           United States Bankruptcy Judge

                                           ENTERED ON DOCKET: MAR 24 2016

Copies to:

Gregory A. Cole
12946 Grove Hill Road, Apt. 204-2
Midlothian, VA 23114

Hunter R. Wells
Canfield, Baer & Heller LLP
2201 Libbie Avenue, Suite 200
Richmond, VA 23230

Rachel A. Greenleaf
Hirschler Fleischer, P.C.
2100 E. Cary Street
Richmond, VA 23223

Susan Hope Call
Counsel for Carl M. Bates, Trustee
P.O. Box 1819
Richmond, VA 23218